**GLEN RAVEN MILLS, INC., Plaintiff,**

v.

**RAMADA INTERNATIONAL, INC., Defendant.**

**No. 93–519–CIV–ORL 22.**

United States District Court,
M.D. Florida,
Orlando Division.

May 24, 1994.

E. Givens Goodspeed, Giles & Robinson, P.A., Orlando, FL, J. Timothy Hobbs, Law Office of J. Timothy Hobbs, Washington, DC, for plaintiff.

Ava K. Doppelt, Allen, Dyer, Doppelt, Franjola & Milbrath, Orlando, FL, John M. Cone, Strasburger & Price, LLP, Dallas, TX, for defendant.

## ORDER

CONWAY, District Judge.

This cause comes before the Court on Plaintiff's Motion for Preliminary Injunction (Dkt. 16), filed March 14, 1994. The Court has considered Plaintiff's initial motion and memorandum of law, Defendant's response, Plaintiff's reply and the argument of counsel at the April 22, 1994 hearing on this motion.

## I. FACTS

Plaintiff Glen Raven Mills, Inc. and its predecessors have been engaged in the manufacture and sale of textiles since the late 1800's. In the 1950's, Plaintiff pioneered the development of durable acrylic fabrics that are especially adaptable to outdoor applications. In connection with this product, Plaintiff began to use the trademark "SUNBRELLA" in 1959 and has used that mark continuously since that date. Plaintiff registered its "SUNBRELLA" trademark under the Federal Trademark Act of 1946 (the "Lanham Act") on December 27, 1960. The registration indicated the mark was to be used for fabrics for awnings, furniture, handbags and sportswear. Plaintiff began to use an additional mark in October 1987 and then registered this second trademark on June 6, 1989. The second trademark includes the term "SUNBRELLA" and the words "Quality-every stitch of the way." Superimposed over the term "SUNBRELLA" is a depiction of an umbrella. The registration indicates the mark is to be used in connection with fabrics for awnings, marine covers, bags and furniture.

In November 1992, Plaintiff learned that Defendant Ramada International, Inc. had filed applications with the United States Patent and Trademark Office ("PTO") to register two service marks to be used with the provision of hotel services in connection with inclusive vacation and travel packages. One

mark consists of the term "SUNBRELLA." The other consists of the term "SUNBRELLA" with a depiction of an umbrella superimposed over the term.

Counsel for Plaintiff contacted Defendant by letter dated December 1, 1992, regarding what Plaintiff viewed to be a potential violation of Plaintiff's rights. An exchange of correspondence followed. In April 1993, Plaintiff became aware of Defendant's actual use of the "SUNBRELLA" mark. This suit ensued.

Plaintiff filed a three count complaint. In Counts I and II, Plaintiff alleges that Defendant has infringed its federal trademark rights under the Lanham Act and has also violated the Lanham Act through unfair competition, false representation and false designation of origin. In Count III, Plaintiff alleges that Defendant has violated the Florida anti-dilution statute. Plaintiff's motion for preliminary injunction addresses both the federal infringement claim and the state dilution claim.

## II. PRELIMINARY INJUNCTION STANDARD

■ A movant for a temporary restraining order or preliminary injunction must show: (1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest.

*Zardui–Quintana v. Richard,* 768 F.2d 1213, 1216 (11th Cir.1985). Moreover, "[t]he preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *Id.* (quoting *United States v. Jefferson County,* 720 F.2d 1511, 1519 (11th Cir.1983).

■ To establish irreparable injury, a movant must show that it will suffer an injury that cannot be adequately compensated if,

at some later point in time, it prevails on the merits of the case.

The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*United States v. Jefferson County,* 720 F.2d 1511, 1520 (11th Cir.1983) (quoting *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 952, 39 L.Ed.2d 166 (1974) (citation omitted) (emphasis in original)).

## III. FEDERAL LAW: INFRINGEMENT OF A MARK

■ The key issue in determining whether a preliminary injunction should issue on an infringement claim is whether a plaintiff is likely to prevail on the merits.

### a. Threshold Inquiry

■ As a preliminary matter, a court must address whether the mark is distinctive enough to deserve protection under the Lanham Act. *Freedom Sav. and Loan Ass'n v. Way,* 757 F.2d 1176 n. 1 (11th Cir.), *cert. denied,* 474 U.S. 845, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985).

The parties do not dispute Plaintiff's right to trademark protection. At least one of Plaintiff's registered trademarks has achieved incontestable status and is presumed to be valid.[1] *Dieter v. B & H Industries of Southwest Florida, Inc.,* 880 F.2d 322, 328 (11th Cir.1989), *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990). Defendant could only challenge Plaintiff's "SUNBRELLA" mark on the basis that the mark is generic. 15 U.S.C. § 1065(4). Although Defendant asserts as an affirmative defense that "SUNBRELLA" is a generic term for a category of goods, Defendant has not pursued or supported this argument in connection with the motion for

---

1. At the time Plaintiff filed this action, its second mark had not yet achieved incontestable status.

From the record before the Court, the current status of the second mark is not entirely clear.

preliminary injunction. Therefore, Plaintiff's mark is entitled to protection under the Lanham Act.

### b. Likelihood of Confusion

▉▉▉ Once the threshold question of whether the mark is distinctive enough to deserve protection is answered affirmatively, the court must turn to the central inquiry in an infringement case. Specifically, the court must determine "whether there is a 'likelihood of confusion' between the names and symbols used by the two parties." *Freedom Sav. and Loan Ass'n*, 757 F.2d at 1179. In the Eleventh Circuit there are primarily seven factors to consider in deciding whether there is a likelihood of confusion. The factors include: 1) the type of mark at issue; 2) similarity of mark; 3) similarity of products or services; 4) identity of purchasers and similarity of retail outlets; 5) similarity of advertising campaigns; 6) the defendant's intent; and 7) actual confusion. *Id.* at 1182–83. The type of mark and evidence of actual confusion are the most important factors. *Dieter*, 880 F.2d at 326.

### 1. Type of Mark

▉▉▉ In analyzing the type of mark, a court must determine whether the mark is strong or weak in order to determine the level of protection to be extended to the mark. In *Freedom Savings and Loan Association*, the Eleventh Circuit explained:

> The more distinctive a plaintiff's servicemark, the greater the likelihood that consumers will associate the registered mark and all similar marks with the registered owner. The law therefore provides the greatest protection to strong and distinctive servicemarks; the strength of a mark depends on the extent of third party usage and the relationship between the name and the service or good it describes.

757 F.2d at 1182. Extensive use by third parties suggests that there would be no likelihood of confusion between the plaintiff and the alleged infringer. *Sun Banks v. Sun Fed. Sav. and Loan Ass'n*, 651 F.2d 311, 316 (5th Cir.1981). In analyzing the relationship between the name and the service or good it describes, the court considers the proper categorization of the mark. Suggestive and arbitrary marks are considered to be the most distinctive marks, and, as relatively strong marks, entitled to the strongest protection. Descriptive marks are much weaker, but may still be entitled to some protection. *Chassis Master Corp. v. Borrego*, 610 F.Supp. 473, 476 (S.D.Fla.1985). A registered mark which has achieved incontestable status is presumed to be "at least descriptive with secondary meaning, and therefore a relatively strong mark." *Dieter*, 880 F.2d at 329.

▉▉▉ Plaintiff has argued that its mark is suggestive in that it requires an effort of the imagination by the consumer to understand that Plaintiff's products offer shade from the sun. Plaintiff also notes that its word mark has achieved incontestable status and therefore is presumed to be at least descriptive with secondary meaning. Separately, Plaintiff has provided ample evidence that its mark has achieved secondary meaning.

Defendant counters by arguing that Plaintiff's mark is a "weak mark because it is suggestive and clearly conveys to purchasers the idea that the goods can be used to shield against the sun, the very purpose for which [Plaintiff's] goods are sold." Ramada International's Opposition to Glen Raven Mills' Motion for Preliminary Injunction (Dkt. 31) ("Defendant's Memorandum") at 6. Defendant cites no support for its assertion that a suggestive mark should be considered a weak mark. It may be that Defendant was attempting to counter an argument that Plaintiff's mark is arbitrary. No such assertion has been made. The Court finds on the evidence before it that Plaintiff's mark is a suggestive mark.

Defendant also argues that evidence of third party use shows that Plaintiff's mark is a weak one. The Court finds that actual third party usage [2] identified by Defendant is found in isolated geographic areas or involves

---

2. Defendant refers to various federal registrations of the "SUNBRELLA" mark. Plaintiff has repeatedly pointed out that none of these other registrants are actually using the "SUNBREL-LA" mark. Therefore, the Court finds the registrations do not support Defendant's argument regarding third party usage.

limited distribution over a widespread area. This type of limited third party usage does not diminish the public's perception that Plaintiff's mark is associated with Plaintiff's products. The Court finds on the evidence before it that Plaintiff's mark is a strong mark.

### 2. Similarity of the Mark

Another factor increasing the likelihood of confusion is a high degree of similarity between the marks. In comparing the marks, a court should consider the overall impression created by the marks rather than comparing their individual features. *Bell-South Advertising & Publishing Corp. v. Real Color Pages,* 792 F.Supp. 775, 781 (M.D.Fla.1991). The analysis should include a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed. *Id. See also Chassis Master Corp.,* 610 F.Supp. at 476 (comparing the appearance, pronunciation and suggestion of the marks).

Plaintiff asserts that the parties' marks are very similar. Defendant does not disagree. The Court agrees that the marks are very similar.

### 3. Similarity of Products or Services

The greater the similarity between products and services, the greater the likelihood of confusion. *Exxon Corp. v. Texas Motor Exchange,* 628 F.2d 500, 505 (5th Cir.1980). The parties agree that there is very little similarity between Plaintiff's acrylic fabric line and Defendant's vacation packages. There is no confusion regarding the source of competing goods. Instead, Plaintiff argues that the type of confusion at issue in this case is either confusion of sponsorship of non-competing goods or reverse confusion.[3]

In support of its argument regarding confusion of sponsorship, Plaintiff refers the Court to several different cases. In two of

those cases, the court noted that the trademark at issue was the triggering mechanism for sale of the product and that the public knew the trademark originated with the plaintiff. *Univ. of Ga. Athletic Ass'n v. Laite,* 756 F.2d 1535, 1546 (11th Cir.1985); *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg.,* 510 F.2d 1004, 1012 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975). Plaintiff has not provided any evidence that purchase of Defendant's vacation packages is triggered by recognition of the "SUNBRELLA" mark as Plaintiff's mark. In another of the cases cited by Plaintiff, the court was faced with a situation in which the public had come to expect licensing and endorsement of the trademark. *Conan Properties, Inc. v. Conans Pizza, Inc.,* 752 F.2d 145, 150 (5th Cir.1985). There is no suggestion in this case that the public has come to expect licensing of trademarks such as Plaintiff's.[4]

Plaintiff also argues that another type of trademark infringement, reverse confusion, is at issue. This claim certainly does not ring hollow given the ever increasing amount of advertising Defendant has undertaken. *See* Defendant's Memorandum at 8. However, the cases cited by Plaintiff examine state law to determine whether this type of infringement is actionable. *See Ameritech, Inc. v. Am. Information Technologies Corp.,* 811 F.2d 960, 965 (6th Cir.1987) (Ohio law); *Big O Tire Dealers v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365, 1371 (10th Cir. 1977) (Colorado law), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978). The Court recognizes that reverse confusion has become "a recognized doctrine within the scope of unfair competition." *Capital Films Corp. v. Charles Fries Productions, Inc.,* 628 F.2d 387, 393 (5th Cir. 1980). However, it is necessary to examine state law to determine whether such a claim

---

**3.** Defendant, in its response, has argued that it is unlikely that the gap between the parties' goods and services will be bridged. Plaintiff has not asserted this theory and, additionally, has argued that a "bridge the gap" argument is only relevant to an analysis of confusion regarding source. Therefore, the Court does not need to consider the merits of this theory based on the facts of this case.

**4.** Plaintiff also suggests that *E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports,* 756 F.2d 1525 (11th Cir.1985) supports its argument. However, the *Remy* case appears to address an error by the district court in determining whether two products were similar. *Id.* at 1530. Arguably *Remy* is a case of confusion of source, not confusion of sponsorship.

may be maintained. *Id.* at 393–94. For the Court to consider Plaintiff's reverse confusion claim, Plaintiff would have to establish the viability of such a claim under applicable state law.

### 4. Identity of Purchasers and Similarity of Retail Outlets

"Likelihood of confusion is more probable if the products are sold through the same channels to the same purchasers." *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1541 (11th Cir.1986). Plaintiff has taken the position that since the parties' goods are non-competing, this factor is of virtually no consequence. Defendant counters by identifying this factor as a "critical element in the analysis." Defendant's Memorandum at 9.

Plaintiff sells its product to fabricators and to distributors who sell to the fabricators. However, as set forth below, Plaintiff advertises its product to the end consumer, *e.g.,* boat owners, homeowners and businesses in the resort and hotel industry. Plaintiff has attempted to create name recognition among end users in order to increase demand for its product. Therefore, it is reasonable to consider the end users as purchasers of Plaintiff's products. Defendant sells its vacation packages to individuals interested in Caribbean or Hawaiian vacations at single destination resort hotels.

Plaintiff has argued that these groups intersect in the resort and hotel industry and in the boating and marine industry. However, to determine whether there is identity of purchasers, the Court must look more closely at purchasers within each industry. Plaintiff sells boat covers to boat owners. Defendant sells dive vacations to individuals who would like to go out on a boat to dive. Plaintiff sells to businesses in the hotel and resort industry. Defendant sells to individuals who want to take advantage of the services of the hotel and resort industry. Plaintiff sells to homeowners the awnings or patio furniture

that will improve quality of life at home. Defendant sells vacations which take individuals away from their homes. On the surface, there is little evidence to support an assertion that the parties sell their goods and services to the same consumers. Yet the Court is not prepared to conclude that there is no identity of purchasers. The parties do market their goods and services to the same general kinds of consumers, *i.e.,* groups that enjoy and provide recreational activities in the sun. *See Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1166 (11th Cir.1982) ("[E]ven if the particular individuals buying goods at the parties' stores differ, the parties would cater to the same general kinds of individuals....")

Retail outlets for Plaintiff's fabric would be the fabricators. Retail outlets for Defendant are travel agencies. Therefore, there is no identity of retail outlets.

### 5. Similarity of Advertising Campaigns

■ "If a plaintiff and defendant both use the same advertising media, a finding of likelihood of confusion is more probable." *AmBrit, Inc.,* 812 F.2d at 1542. A court may properly consider the overall advertising campaigns. *Freedom Sav. and Loan Ass'n.,* 757 F.2d at 1185.

Both parties advertise in periodicals within their own industry and in periodicals which are distributed to the general public. Plaintiff has argued that its own advertisements emphasize superior quality and tastefulness, while Defendant's advertisements rely on sexual innuendo. Whatever terms are used to describe the parties' advertisements, it is clear that the tone of Plaintiff's advertisements is very different from the tone of Defendant's advertisements. In assessing the similarity of advertising campaigns, the difference in tone does not seem to support a finding of likelihood of confusion.

Although the parties do not advertise in the same magazines,[5] they both advertise

---

5. Plaintiff has provided the Court with one situation in which the parties' advertisements may appear in very close proximity. Some airlines provide magazines for passengers to peruse during their flight. At least in some cases, the magazines are placed in a jacket with a clear plastic front and a sturdy back. Plaintiff has

provided evidence that US Air and American Airlines printed Defendant's advertisement on the back of the protective jacket. If the jacket, and such an advertisement, were affixed to a magazine in which Plaintiff advertises, there would be a direct overlap of advertising media used. However, the Court has no indication of

their products in popular magazines of national distribution. Especially given the types of magazines in which Defendant advertises, there would be some overlap in readers. *Safeway Stores*, 675 F.2d at 1166.

Even though the tone of the advertisements is dissimilar, the likelihood of overlap in readers suggests that the advertising campaigns of the parties would contribute to the likelihood of confusion.

### 6. Defendant's Intent

■ Likelihood of confusion may be established by evidence that a defendant intended to benefit from the reputation of a plaintiff's service or product by inducing confusion. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 23.-32[1]. "If a person intends to induce confusion among customers, he or she is likely to succeed." *Freedom Sav. and Loan Ass'n*, 757 F.2d at 1185. Therefore, consideration of intent of the defendant is relevant to an analysis of likelihood of confusion.

Plaintiff has established that Defendant was aware of Plaintiff's trademark before Defendant started using the "SUNBRELLA" mark. According to Mr. Nikolas Eastwick–Field, a senior vice-present for Defendant, "SUNBRELLA" was one of a number of possible marks proposed by an outside advertising agency. Affidavit of Nikolas Eastwick–Field (Dkt. 32) at 1. Defendant made two different searches of the Federal Trademark Register, which revealed different registrations of the mark, including Plaintiff's. *Id.* at 2. In Defendant's opinion, none of the registrations had any relation to travel or vacation services. *Id.* Defendant made no effort to determine the extent of use by other registrants of the "SUNBRELLA" mark. *See id.* Without additional research, Mr. Eastwick–Field had applications filed to register Defendant's two marks with the PTO. These applications were filed by an attorney for Defendant. Affidavit of Dana Wilson Easley (Dkt. 37) at 1. However, the Court can find no indication that Defendant obtained a legal opinion from its attorneys regarding potential liability for infringement or other claims of unfair competition prior to the time Defendant was contacted by Plaintiff. Instead, Defendant relied on the examination by a trademark examining attorney regarding the existence of conflicting marks. This type of examination is conducted on an *ex parte* basis without the benefit of the extensive data that has been presented to the Court, at least some of which would have been available to Defendant if Defendant had elected to do more than simply conduct searches in the Federal Trademark Register.[6]

Defendant's conduct suggests a remarkably casual approach to intellectual property issues. While such an approach would not be surprising in the case of a small proprietor starting up a business, it does seem extraordinary for a firm with a national or international presence. However, Defendant's conduct does not suggest that Defendant intended to derive benefit from Plaintiff's reputation, which is the issue before the Court at this point.

■ Plaintiff has argued that Defendant's conduct is part of "an established pattern of disregard for the trademark concerns of other companies."[7] Plaintiff's Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction (Dkt. 17) at 14. An argument of willful blindness may be relevant to a variety of issues raised by a party. However, it is not relevant to the intent that is at issue in a likelihood of confusion case. *See generally,* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, §§ 23.31–23.34. On the evidence before the Court, Defendant's intent does not support a likelihood of confusion.

the likelihood of such a combination of events. The two magazines with jackets attached which Plaintiff provided for the Court are not magazines in which Plaintiff advertises.

6. Of course, an examination by a trademark examining attorney also would not provide much guidance regarding potential liability for other types of claims, such as dilution.

7. Plaintiff has also argued that statements made by one of Defendant's employees in connection with an unrelated lawsuit provide further support for this pattern of disregard. The Court is not willing to draw inferences from this unrelated incident at this stage in the litigation.

### 7. Actual confusion

 " 'Although evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion.' " *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 978 (11th Cir.1983) (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir.1980)). Actual confusion by a few customers is evidence of likelihood of confusion by many customers. *Freedom Sav. and Loan Ass'n*, 757 F.2d at 1185. Therefore, a plaintiff usually will not have to prove more than a few incidents of actual confusion. *Id.*

 As a preliminary matter, the Court must identify Plaintiff's "customers." As set forth above, Plaintiff sells directly to fabricators and distributors. Plaintiff's products are then sold to various end users. The Court may properly consider evidence of confusion from either direct purchasers or end users. *See BellSouth Advertising & Publishing Corp., Inc.*, 792 F.Supp. at 783. However, one of the individuals Plaintiff asserts was confused was a salesman from Monsanto, one of Plaintiff's suppliers. Plaintiff has not provided the Court with caselaw in which the court considered confusion among suppliers in the analysis. Therefore, the Court will disregard Plaintiff's assertions regarding the confusion of Mr. Joe Buck.

Plaintiff's first alleged example of actual confusion involves Mr. John M. Capron, one of Plaintiff's long time fabricators/distributors and one of the more exclusive users of Plaintiff's trademark. Plaintiff asserts that Mr. Capron initiated contact with Plaintiff when he saw Defendant's advertisement. He expressed concern that Plaintiff was licensing its mark, which would dilute the value of Mr. Capron's use of the mark. After Plaintiff explained the situation, Plaintiff suggested that Mr. Capron write a letter to Plaintiff expressing his concerns.[8] Plaintiff's allega-

tions regarding Mr. Capron are supported by the declaration and deposition testimony of Mr. Edmund R. Gant and by a copy of the letter sent by Mr. Capron to Plaintiff.

Plaintiff's second alleged example of actual confusion involves Ms. Amy C. Parke. Plaintiff asserts that Ms. Parke made an inquiry regarding the relationship between the parties' products and, at the request of Plaintiff, followed up this inquiry with a letter. Defendant asserts that Ms. Parke is "a good friend of the daughter of [Plaintiff's] General Manager." Defendant's Memorandum at 13. However, Defendant does not suggest that the initial inquiry was solicited or insincere. Ms. Parke's relationship to Plaintiff's employees and their family members may simply explain how Plaintiff became aware of Ms. Parke's confusion. On the other hand, the Court notes that the letter Ms. Parke sent shows a remarkable grasp of key words used in the analysis of likelihood of confusion. Plaintiff's allegations regarding Ms. Parke are supported by the deposition testimony of Mr. Gant and a copy of the letter sent by Ms. Parke to Plaintiff.

Plaintiff's third alleged example of actual confusion involves Ms. Betty Jones, a travel agent.[9] Ms. Jones saw Defendant's advertisements and made a comment regarding the advertisements to Plaintiff's representatives. At the request of Plaintiff, Ms. Jones sent a letter to Plaintiff. Plaintiff's allegations regarding Ms. Jones are supported by the deposition testimony of Mr. Gant and by a copy of the letter sent by Ms. Jones to Plaintiff.

The difficulty with Plaintiff's allegations of actual confusion is the evidence offered in support. Both the declaration and deposition testimony of Mr. Gant include impermissible hearsay. It is not clear whether the letters drafted at the request of Plaintiff reflect the initial concerns expressed by these consum-

---

8. Defendant has characterized all of the calls and letters received by Plaintiff from Mr. Capron and other allegedly confused consumers as "solicited responses." Defendant's Memorandum at 13. However, the deposition testimony of Mr. Edmund R. Gant, Chairman and Vice President of Plaintiff, makes it clear that Plaintiff did not solicit the consumers' initial inquiries. Plaintiff's

request that these individuals memorialize their concerns in writing does not suggest that the initial inquiry or concern was solicited.

9. Defendant suggests that Ms. Jones supplies travel services to Plaintiff's exclusive West Coast representatives.

ers or a modification of those concerns after discussion with Plaintiff's employees. In any case, Plaintiff has not established a proper foundation for the admissability of any of the letters.

The Court cannot dismiss the possibility that actual confusion has occurred. However, on the record before the Court, Plaintiff has not established the existence of actual confusion.

### c. Conclusion

Plaintiff has established several of the factors in the likelihood of confusion analysis. Plaintiff has strong marks, and Defendant's marks are very similar. It appears likely that the type of advertising campaign used by Defendant will result in confusion, and it is possible that there is some identity of customers. The case is a close one, and Plaintiff may well prevail after a full trial on the merits. Yet the Court is not persuaded at this point that Plaintiff has met its burden for injunctive relief under federal law. Therefore, Plaintiff is not entitled to a preliminary injunction on its infringement claim.

### IV. STATE LAW: DILUTION

■ Plaintiff alleges that Defendant's use of the "SUNBRELLA" trademark dilutes its own use of the mark. Section 495.151, Florida Statutes, provides:

Every person, association, or union of workingmen adopting and using a mark, trade name, label or form of advertisement may proceed by suit, and all courts having jurisdiction thereof shall grant injunctions, to enjoin subsequent use by another of the same or any similar mark, trade name, label or form of advertisement if it appears to the court that there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark, trade name, label or form of advertisement of the prior user, notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services.

The plain language of the statute indicates that a claim of dilution may be made even if the goods and services involved are non-competing and even if there is no likelihood of confusion. *Safeway Stores,* 675 F.2d at 1167. Therefore, although a party must establish prior use of the mark in the State of Florida, there is no need for a court to inquire into the territorial scope of a business when considering a dilution claim. *Id.*

■ On the other hand, the statute clearly requires that the marks be the same or similar. In the context of Plaintiff's infringement claim, the Court noted that Defendant had not disagreed with Plaintiff's claim that the marks are very similar. Since a dilution claim cannot be maintained unless the marks are found to be similar, a more detailed analysis of similarity is required.

■ As set forth above, Plaintiff has registered two trademarks. One is simply the word "SUNBRELLA." The other is a combination of the word "SUNBRELLA," a depiction of an open umbrella, the phrase "Quality—every stitch of the way," and three small fabric samples that appear to be "pinned" to the mark with a needle. In addition to these registered marks, Plaintiff uses a combination of the word "SUNBRELLA," the open umbrella, and the words "Glen Raven Mills, Inc."

Defendant has filed two service marks with the PTO. One is simply the word "SUNBRELLA." The other is a combination of the word "SUNBRELLA" and a depiction of an open umbrella. In addition to these marks that have been filed with the PTO, Defendant uses a combination of the word "SUNBRELLA," an open umbrella and the word "vacations" or the words "inclusive vacations."

To facilitate analysis, the Court will compare the word marks and the marks combined with an umbrella (the "umbrella marks") separately. Comparison of the umbrella marks will include the umbrella marks registered or filed with the PTO and also the variations on those marks which the parties use.

The parties' word marks are spelled and pronounced exactly the same. Plaintiff's word mark appears most often with an initial capital letter followed by letters in lower case, although on occasion the word may appear entirely in upper case. The word

typically is shown in black letters on a light background or white letters on a dark background. From the evidence before the Court, Defendant's word mark consistently appears with an initial capital followed by lower case letters, all in black. Review of these marks leads the Court to conclude that the parties word marks are virtually identical.

There is slightly more variation in the parties' umbrella marks. Both of Plaintiff's umbrella marks include an open umbrella immediately above the two "l's." The "l's" appear to provide support for the open umbrella. The open umbrella reveals three panels, each of which is a different color, specifically yellow, red and blue. Defendant also uses an open umbrella in connection with both of its umbrella marks. In the Defendant's original design for the mark, the support for the umbrella curves down and falls between the "r" and the "e" in "SUN-BRELLA." The design of the umbrella is somewhat abstract. It is outlined in red, and yellow is used to color the open panels. More recently, Defendant's umbrella mark appears with an open umbrella angled above the "n." The style of the umbrella is more angular, and it is orange in color. Immediately above the umbrella, a yellow orb, representing the sun, has been added.

Additionally, there are differences in the color and style of print used. Plaintiff's umbrella mark is consistently presented in blue, while Defendant's umbrella mark, which started in black, is now in shades of yellow and orange. In plaintiff's umbrella marks, the word "Sunbrella" appears entirely in lower case, with the letters "u" and "n" joined. Defendant, in its umbrella marks, has changed from using an initial capital followed by lower case letters, to all upper case letters. Finally, although both parties add extra words in connection with their umbrella marks, these words are in comparatively small print and do not seem to influence the visual presentation of the marks.

After scrutinizing the marks used, the Court has identified these differences in the

presentation of the parties' umbrella marks. Yet all of these differences appear to be minor when the advertisements are placed side by side. It is the unusual term "SUN-BRELLA" combined with a depiction of an open umbrella that catches the eye. When comparing the umbrella marks, what is striking is the remarkable similarity of the marks.

The Court finds that the parties' word and umbrella marks are either the same or sufficiently similar to satisfy the statutory requirement.[10]

■ In addition to the statutory requirement of similarity between the marks, courts have also imposed the requirement that a mark be unique or distinctive before it is entitled to protection. *Freedom Sav. and Loan Ass'n,* 757 F.2d at 1186. The Florida Supreme Court has recently elaborated on this requirement in *Great Southern Bank v. First Southern Bank,* 625 So.2d 463, 470–71 (Fla.1993). In addressing in greater detail the requirement that a mark be "highly distinctive," the court referred to comment e of the Restatement (Third) of Unfair Competition § 25 (Tentative Draft No. 2, 1990) (the "Restatement"). *Id.* at 470 & n. 20. Comment e provides in relevant part:

> The cause of action for dilution protects the selling power of a mark. Not all marks that identify the source or sponsorship of goods or services warrant such protection. To possess the selling power protected by the anti-dilution statutes, the mark must have a degree of distinctiveness beyond that needed for the designation to function as a valid trademark. The required standard of distinctiveness, however, cannot be defined by bright-line rules. A trademark is sufficiently distinctive to be diluted by a nonconfusing use if the mark retains its source significance when encountered outside the context of the goods or services with which it is used by the trademark owner. For example, the trademark KODAK evokes an association with the cameras sold under that mark whether the word is displayed with the cameras or used in the abstract. On the

**10.** Throughout its dilution analysis, Defendant has relied heavily on *Mead Data Central v. Toyota Motor Sales,* 875 F.2d 1026 (2d Cir.1989). Since

the court in *Mead Data* concluded that the marks at issue were not similar, much of the analysis of that court is inapplicable to the case at hand.

other hand, the designation ALPHA may become sufficiently distinctive to identify a source of cameras when it is affixed to the cameras, but its use alone and out of its market context may continue to evoke many different associations, including nothing more than the first letter of the greek alphabet. A mark that evokes an association with a specific source only when used with the particular goods or services that it identifies is not sufficiently distinctive to be protected under the anti-dilution statutes.

To provide additional guidance in determining the "highly distinctive" requirement, the court in *Great Southern*, once again quoting from comment e of the Restatement, identified certain factors to consider. The factors included 1) the inherent distinctiveness and uniqueness of the mark; 2) the duration and extent of its use; 3) the duration and extent of advertising that emphasizes the mark; and 4) the degree of recognition by prospective purchasers. *Id.* Yet another factor to consider is third party uses of the mark.

Plaintiff has been using its word mark since 1959 and its umbrella mark since 1987. Plaintiff has provided the declarations of fabricators/distributors and Mr. Stephen M. Warner, President of the Industrial Fabrics Association International, to establish the duration and extent of use of the word mark. These individuals have stated that Plaintiff's product is highly regarded within the industry and that its mark is well recognized. Survey data further supports Plaintiff's assertion that its mark is recognized by prospective purchasers. Plaintiff's annual advertising expenditure is currently approximately $3 million and has exceeded $2 million in four of the past five years. Advertisements may be found in magazines which are nationally distributed. The details of the extent of advertising from the late 1980's to the present have been set forth in Mr. Gant's declaration. Mr. Warner has provided copies of advertisements appearing since 1959 in magazines produced by Industrial

Fabrics Association. Although some third party usage does exist, the Court has already found that actual third party usage of the "SUNBRELLA" mark identified by Defendant occurs in isolated geographic areas or involves limited distribution over a widespread area.

To analyze the inherent distinctiveness and uniqueness of Plaintiff's mark, the Court turns to the categories of marks identified by J. Thomas McCarthy in his treatise, *McCarthy on Trademarks and Unfair Competition.* The categories in order from most distinctive to least distinctive are 1) fanciful or coined; 2) arbitrary; 3) suggestive; 4) descriptive; and 5) generic. The Florida Supreme Court has approved these categories and their accompanying definitions and has adopted them for use with chapter 495, Florida Statutes. *Great Southern*, 625 So.2d at 467–69.[11]

When considering Plaintiff's infringement claim, the Court found that Plaintiff's mark was suggestive. In claims based on chapter 495, Florida Statutes, the Florida Supreme Court has approved three tests to determine whether a mark is suggestive.

> Suggestive marks defy easy definition. Three tests have evolved to determine whether a mark is suggestive: the imagination test (how much imagination is required by the customer to get some description of the product from the term); the competitor's need test (is the mark needed by competitors to describe their goods); the competitor's use test (to what extent is the mark used by others on similar products).

*Id.* at 468 (citations omitted) (footnote omitted). The last two tests do not seem relevant to this case. The parties are not competitors, and no argument has been made that competitors need or use the term "SUNBRELLA." With respect to the imagination test, the Court has already accepted Plaintiff's assertion that it requires an effort of the imagination by the consumer to understand that Plaintiff's products offer shade from the sun. The challenge in applying the

---

11. Although the Florida Supreme Court approved and adopted Mr. McCarthy's definitions in the context of an infringement analysis, the court adopted the definitions for use in chapter 495 in general. Therefore, the definitions are equally applicable in the dilution analysis.

one remaining test is to quantify the imagination required.

The term "SUNBRELLA" easily breaks down to the components "sun" and "umbrella." An umbrella most often is used in today's world to offer protection from inclement weather. It does not take much imagination to think of an object shaped like an umbrella that would offer protection from the light and heat of the sun. For example, a customer could imagine a parasol, a beach umbrella or an umbrella covering a patio table. It takes more imagination to recognize the combination of "sun" and "umbrella" and then think of products that are not shaped like an umbrella, but which nonetheless offer protection from the light and heat of the sun. Plaintiff's products in this category include awnings, cabanas and boat covers. It takes yet another level of imagination to think of an umbrella offering protection from the sun and then associate that image with the one protection most critical to Plaintiff's success—protection from the destructive elements of nature. Plaintiff's reputation is based on exceptional quality, and its product is known for its colorfastness and resistance to rotting and mildew. The Court finds that a relatively high level of imagination is needed to view Plaintiff's mark and then associate that mark with a highly durable fabric that can assume a wide variety of shapes in order to offer protection from the elements. Therefore, under the tests approved by the Florida Supreme Court, the Court finds that Plaintiff's mark is suggestive.

A finding that Plaintiff's mark is suggestive does not automatically lead to the conclusion that the mark is highly distinctive. In its discussion of what constitutes highly distinctive, the Florida Supreme Court once again quoted from comment e of the Restatement:

There is nothing in the requirement that the mark be highly distinctive that necessarily limits dilution protection to coined or fanciful marks. It is possible that an arbitrary mark, or even a mark that was originally descriptive but that has acquired secondary meaning, may by extensive advertising and long and exclusive use acquire a

sufficiently high degree of distinctiveness to justify protection against dilution. However, this will rarely be the case because competitors and others remain entitled to use such words in their primary, lexicographic sense, and this permissible alternative use makes it unlikely that consumers will associate the designation exclusively with the trademark owner.

*Great Southern,* 625 So.2d at 470. This excerpt does not make any reference to suggestive marks. Review of the comment itself reveals that the proper treatment of suggestive marks is not addressed. It is clear, however, that the concerns that exist when extending protection to descriptive marks with secondary meaning are not present with the "SUNBRELLA" mark. Since "SUNBRELLA" is not a term necessary to describe a particular product or service, others are not unreasonably hampered in promoting their product by selecting a mark other than "SUNBRELLA."

Plaintiff's mark is a suggestive mark requiring a relatively high level of imagination. It has been advertised extensively for several years and has been used for thirty or more years. The Court finds that Plaintiff's mark is a highly distinctive one and is entitled to protection from dilution.

 Section 495.151 requires a showing of either a likelihood of injury to business reputation or a likelihood of dilution of the distinctive quality of the mark. Injury to business reputation may be established if the second user of the mark is not financially sound and a lack of financial reliability is then attributed to the first user. *Gaeta Cromwell, Inc. v. Banyan Lakes Village,* 523 So.2d 624, 627 (Fla. 4th DCA 1988), *disapproved on other grounds in Great Southern Bank v. First Southern Bank,* 625 So.2d 463, 469 (Fla.1993). No such injury has been alleged in this case. Injury to business reputation may also be established by tarnishment. Comment g of the Restatement provides that "[t]he antidilution statutes also protect the positive associations evoked by a mark from subsequent uses that may disparage or tarnish them." Plaintiff has argued that the sexual overtone of Defendant's advertisements tarnishes Plaintiff's image. In

support of its tarnishment argument, Plaintiff relies on *Community Federal Savings and Loan Association v. Orondorff,* 678 F.2d 1034 (11th Cir.1982), which involved a billboard for a bar with topless dancers. Defendant argues that its advertising is not offensive in light of the type of advertising commonly seen in magazines today and is not at all offensive when compared with other advertisements in the travel industry. The Court is not entirely persuaded that advertising appropriate for Defendant's industry cannot tarnish the positive associations evoked by Plaintiff's mark. On the other hand, Defendant's advertisements are not quite equivalent to advertisements for a topless bar. Although Plaintiff may ultimately prevail on this argument, the Court is not prepared to conclude on the evidence before it that there is a likelihood of injury to business reputation through tarnishment.

██ Alternately, Plaintiff may meet the statutory requirement by establishing likelihood of dilution of the distinctive quality of its mark. According to the Eleventh Circuit, "[i]f the plaintiff holds a distinctive trademark, it is enough that the defendant has made significant use of a very similar mark." *Freedom Sav. and Loan Ass'n,* 757 F.2d at 1186. Given the extent of Defendant's advertising in periodicals with a broad base of circulation, the Court has before it competent evidence of likelihood of dilution of the distinctive quality of Plaintiff's mark.

Ordinarily, the Court would at this point be in a position to conclude that Plaintiff has established a likelihood of success on the merits of its dilution claim. However, Defendant has raised one additional argument that must be addressed. Defendant asserts that a mark which is distinctive to a particular class of purchasers is protected against dilution only from marks which are also being marketed to that same class. The last paragraph of comment e of the Restatement provides:

A mark that is highly distinctive only to a particular class of purchasers may be protected from diluting uses directed at that particular class. Thus, a mark may evoke

strong mental associations among residents in a limited geographic market or among purchasers of a specific type of product. However, in such circumstances protection from dilution is appropriate only against uses specifically directed at that particular class of purchasers; uses of the mark in broader markets, although they may product an incidental diluting effect in the protected market, are not actionable.

The Restatement also provides an example of the application of this "class of purchasers" principle. The example is based on *Mead Data Central v. Toyota Motor Sales,* 875 F.2d 1026 (2d Cir.1989), a case on which Defendant relies.[12]

Whether the principle of law asserted by Defendant could or should be applied to the Florida anti-dilution statute is not clear. It is clear that the Florida Supreme Court has approved and adopted significant portions of the Restatement. *See Great Southern Bank,* 625 So.2d 463 (Fla.1993). For example, comment e of the Restatement consists of four paragraphs. In *Great Southern,* the court quoted in large part or in full from the first three paragraphs of the comment. *Id.* at 470 & n. 20. Yet the court made no reference at all to the fourth paragraph, which contains the "class of purchasers" argument. It would be difficult to argue that the Florida Supreme Court was unaware of the entire text of comment e, including the fourth paragraph. The question, then, is why the last paragraph was not included.

There also is the question of how the phrase "particular class of purchasers" should be interpreted and applied to the facts of this case. The Court is not aware of any guidance in this area in cases interpreting Section 495.151. For example, the court in *Orondorff* did not analyze the characteristics of the class of purchasers that frequented the defendant's topless bar and compare those characteristics to the class of purchasers that subscribed to the plaintiff's banking services. *Community Fed. Sav. and Loan Ass'n v. Orondorff,* 678 F.2d 1034 (11th Cir.1982). To establish dilution, the plaintiff only had to

---

**12.** As set forth above, in large part the *Mead Data* case is distinguishable from the case at

hand since the court in that case found that the marks are not similar.

establish that its customers would be exposed to advertising for the topless bar. *Id.* at 1037.

Finally, application of the "class of purchasers" principle could raise some policy concerns. *See Mead Data,* 875 F.2d at 1033–34 (Sweet, J. concurring). It is conceivable that a large firm with significant assets and a national presence could select a mark that it knew to be the highly distinctive mark of a non-competing smaller firm with a nationwide customer base but proportionately more limited assets. The large firm could then launch an advertising campaign at a broad segment of the population which includes as a subset the customers of the first user. Arguably, the first user would be entirely unprotected under a literal reading of comment e, even if its mark were a highly distinctive one. However, a literal reading may be inconsistent with the policy concerns underlying the dilution statute.

Until the Court is able to determine whether the "class of purchasers" requirement should be applied to a dilution claim under Section 495.151, the Court cannot conclude that Plaintiff is likely to succeed on the merits of its dilution claim. Therefore, Plaintiff is not entitled to injunctive relief at this stage of the litigation.

## V. ALLEGED DELAY IN MOVING FOR A PRELIMINARY INJUNCTION

Defendant has argued that Plaintiff's motion should be denied because of Plaintiff's delay in moving for a preliminary injunction. The Court finds that Plaintiff has responded promptly to protect its rights each time Plaintiff has been made aware of Defendant's use of the "SUNBRELLA" mark, or increased use of the "SUNBRELLA" mark.

Accordingly, it is ORDERED:

1. The Motion for Preliminary Injunction (Dkt. 16) is DENIED.

2. This case shall proceed to trial on an expedited basis, unless Plaintiff files and serves, within eleven (11) days of the date of this Order, a notice that Plaintiff does not want an earlier trial date. If Plaintiff files such a notice, the Court cannot guarantee a date certain for trial. In the event that Plaintiff does not file such a notice, trial in this action will be scheduled for a date certain of July 27, 1994.

3. Plaintiff filed a Stipulated Motion to Extend Discovery (Dkt. 27) on March 29, 1994. Plaintiff seeks to extend discovery through July 31, 1994. Plaintiff's motion is GRANTED in part. The discovery deadline is extended to June 30, 1994.

DONE AND ORDERED.