**INMUNO VITAL, INC., a Florida corporation, Plaintiff/Counter–Defendant,**

v.

**GOLDEN SUN, INC., a California corporation, Defendant/Counterclaimant.**

No. 95–2107–Civ–MORENO.

United States District Court, S.D. Florida.

Dec. 3, 1997.

James A. Gale, John C. Carey, Feldman Gale & Weber, P.A., Miami, FL, for plaintiffs.

Michael A. Mullen, Gaebe, Murphy, Mullen & Antonelli, Coral Gables, FL, Dennis G. Martin, Blakely, Sokoloff, Taylor & Zafman, Los Angeles, CA, for defendants.

## MEMORANDUM OPINION

MORENO, District Judge.

This is a trademark dispute between two companies competing for the rights to the mark VIDA VITAL in connection with the sale of nutritional supplements (vitamins) and herbal tea products. Because this Court finds that material facts remain in

issue, the Court denies both parties' motions for summary judgment.

## I. LEGAL STANDARD

Summary judgment is authorized when there is no genuine issue of material fact. Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must present more than a scintilla of evidence in support of the nonmovant's position. A jury must be able reasonably to find for the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. FACTUAL BACKGROUND

**A. Golden Sun:** In January 1992, Defendant Golden Sun, Inc., a California-based corporation with twenty years experience in the dietary supplement business, began selling a nutritional supplement (vitamin)[1] product known as VIDA VITAL. From that date through March 1994, Golden Sun's sales of VIDA VITAL products were limited to the following states:

| State | Bottles Sold | Total Sales |
|---|---|---|
| Illinois | 20 | $ 23.62 |
| Florida | 124 | $ 652.41 |
| New Jersey | 16 | $ 54.46 |
| Texas | 648 | $ 2,915.34 |
| Puerto Rico | 1,564 | $ 3,729.60 |
| California | 12,351 | $ 35,536.22 |

In August 1995, Golden Sun began selling a vitamin known as "Cat's Claw"[2] under the VIDA VITAL mark. Since that time, Golden Sun has generated gross revenues of at least $227,550.00 and gross profits of at least $159,285.00. Golden Sun achieved success selling this product despite conducting no newspaper, magazine, radio or television advertising for any product under the VIDA VITAL mark prior to March 1996, and despite spending no more than nine thousand dollars advertising this product since March 1996.

**B. Inmuno Vital:** In late 1993, Plaintiff Inmuno Vital, a Florida corporation based in Miami, conducted a nationwide search that revealed no prior use of the VIDA VITAL mark. In March 1994, without knowing of Golden Sun's existence, Inmuno Vital began selling Cat's Claw under the name VIDA VITAL. However, Inmuno Vital referred to its Cat's Claw product as a herbal tea, not as a nutritional supplement. Almost immediately thereafter, Inmuno Vital began advertising its VIDA VITAL Cat's Claw herbal tea product through a variety of print and electronic media, including the magazine *TV y Novelas,* the newspapers *Viva Semanal, Exito,* and *El Nuevo Herald,* various radio stations, and the Telemundo and Univision television networks. Inmuno Vital's approximate advertising expenditures from 1994–1996 are as follows:[3]

---

1. The product may be classified as either a vitamin or a nutritional supplement. For ease of reference, the Court shall refer to the product as a nutritional supplement.

2. Cat's Claw is a vine native to South America. The name is derived from the shape of tendrils that attach the plant to trees.

3. Although Golden Sun raises various challenges to the overall level of Inmuno Vital's advertising expenditures, there is no dispute that Inmuno Vital spent hundreds of thousands of dollars promoting its Cat's Claw product.

| Year | Advertising Expenditures |
|------|--------------------------|
| 1994 | $ 62,000.00 |
| 1995 | $886,000.00 |
| 1996 | $932,000.00 |

Since March 1994, Inmuno Vital has sold approximately 800,000 bottles of VIDA VITAL Cat's Claw and generated approximately eight million dollars in revenue on those sales. Furthermore, the geographic scope of its sales has continually expanded. In 1994, Inmuno Vital sold the product in 14 states and Puerto Rico. One year later, Inmuno Vital sold the product in 35 states and the District of Columbia. By 1996, customers in 46 states purchased Inmuno Vital's VIDA VITAL Cat's Claw product. Although sales data is not available by state for 1994, Inmuno Vital's sales in a few select states in 1995 and 1996 are as follows:

| State | Bottles Sold | Total Sales |
|-------|-------------|-------------|
| Arizona | 76 | $ 2,048.60 |
| | 963 | $ 17,643.89 |
| California | 18,016 | $ 265,358.28 |
| | 16,497 | $ 253,739.15 |
| Florida | 71,610 | $ 823,538.52 |
| | 53,595 | $ 618,567.99 |
| Illinois | 1,239 | $ 20,026.15 |
| | 1,189 | $ 9,193.90 |
| New Hampshire | 1,188 | $ 14,671.08 |
| | 1,039 | $ 11,346.24 |
| New Jersey | 25,705 | $ 337,960.88 |
| | 16,753 | $ 213,161.43 |
| New York | 101,885 | $ 887,312.00 |
| | 14,579 | $ 175,044.23 |
| New Mexico | 1,767 | $ 24,854.65 |
| | 1,978 | $ 28,450.78 |
| Ohio | 2,696 | $ 33,539.60 |
| | 1,342 | $ 17,033.56 |
| Pennsylvania | 36,397 | $ 353,482.22 |
| | 58,285 | $ 559,264.25 |
| Puerto Rico | 16,175 | $ 204,220.81 |
| | 2,653 | $ 7,378.53 |
| Texas | 18,188 | $ 265,521.62 |
| | 17,434 | $ 247,054.65 |
| Washington | 21 | $ 628.95 |
| | 1,145 | $ 6,867.78 |

**C. The Trademark Applications:** On February 24, 1994, Inmuno Vital filed a petition with the United States Patent and Trademark Office for trademark registration of its VIDA VITAL mark as a nutritional supplement under class 5 of the international trademark classification system. In its original trademark application, Inmuno Vital classified its product as "nutritional supplements, namely herbal tea." Inmuno Vital subsequently amended its trademark application to classify the product as "herbal teas for medicinal purposes."

On March 21, 1995, Inmuno Vital's application was published in the Official Gazette of the United States Patent and Trademark Office ("USPTO"). In April 1995, Golden Sun filed an opposition to Inmuno Vital's application for trademark registration. Inmuno Vital did not become aware of Golden Sun's opposition until June 26, 1995, when Golden Sun sent Inmuno Vital a letter directing it to "cease and desist" selling its Cat's Claw products under the VIDA VITAL mark. After Golden Sun filed its objection to Inmuno Vital's class 5 trademark application, the USPTO indicated that Inmuno Vital's class 5 registration might be refused because its product might be confused with Golden Sun's. Inmuno Vital informed the USPTO that the products would not likely be confused because "the goods in the cited application (herbal teas) are entirely dissimilar to applicant's goods (dietary supplements)." The PTO subsequently withdrew its objection, and Inmuno Vital's contested class 5 trademark application remains pending.

On June 19, 1995, one week prior to receiving Golden Sun's "cease and desist" letter, Inmuno Vital filed an application for trademark registration of VIDAL VITAL as a herbal tea for food purposes under class 30 of the international trademark classification system. This trademark classification specifically excludes herbal teas for medicinal purposes from its scope. Golden Sun did not oppose Inmuno Vital's class 30 applications because Golden Sun understood that these class 30 applications were for VIDA VITAL for food purposes, not nutritional supplements, and therefore Golden Sun concluded that a class 30 registration would not affect Golden Sun's alleged trademark rights. After this suit was filed, Inmuno Vital received a class 30

trademark registration on the mark VIDA VITAL for herbal tea for food purposes. Inmuno Vital received the trademark registration without submitting or being required to submit evidence of consumer recognition of the mark.

**D. Some Comments and Loose Ends:** Inmuno Vital thus obtained a trademark for VIDA VITAL in class 30, which excludes herbal teas for medicinal purposes, yet has a pending application for trademark registration of the same product in class 5, which includes medicinal teas (i.e., nutritional supplements). Although both Inmuno Vital and Golden Sun claim trademark rights to the mark VIDA VITAL, not the product Cat's Claw, both parties sell Cat's Claw under the VIDA VITAL mark, albeit under different alleged categorizations. Therefore, the central issue in this case is whether there may be a trademark for VIDA VITAL as a nutritional supplement and a separate mark for VIDA VITAL as an herbal tea. The parties have submitted evidence indicating that competitors sell Cat's Claw both as a nutritional supplement and as an herbal tea (of course, these competitors do not sell their products under the mark VIDA VITAL).

## III. THE PARTIES' POSITIONS

Golden Sun claims that it has the right to VIDA VITAL for all products at issue in this case, that Inmuno Vital has misappropriated its trademark, and that Inmuno Vital has falsely advertised its VIDA VITAL Cat's Claw product. To the extent that Inmuno Vital has trademark rights in the VIDA VITAL mark, Golden Sun contends that the Court should apply the equitable doctrine of unclean hands and refuse to recognize any such rights.

Inmuno Vital contends that Golden Sun never had an interest in the mark VIDA VITAL, at least as applied to herbal teas, and that Golden Sun's use of the mark in connection with this product violates Inmuno Vital's trademark rights.

## IV. DOES GOLDEN SUN HAVE ANY TRADEMARK RIGHTS?

■ **A. The Standard:** A party claiming statutory and common law trademark infringement and unfair competition must establish that (1) it is the owner of a valid trademark, and (2) the use of the contested mark is likely to cause confusion. *Dieter v. B & H Industries of Southwest Florida*, 880 F.2d 322, 326 (11th Cir.1989), *cert. denied*, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990); *Burger King v. Mason*, 710 F.2d 1480, 1491 (11th Cir.1983), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984). Although the parties agree that Golden Sun's use of the VIDA VITAL mark preceded Inmuno Vital's, the parties dispute whether Golden Sun is the valid owner of the VIDA VITAL trademark. Therefore, to prevail on its counterclaim, Golden Sun must have obtained trade rights in the mark prior to Inmuno Vital's first use. *Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.*, 934 F.2d 1551, 1559 (11th Cir. 1991).

■ Golden Sun may claim rights in the mark upon first use only if the VIDA VITAL mark is inherently distinctive. *Id.* (citation omitted). The distinctiveness of the VIDA VITAL mark refers to how easily customers identify the mark with the product. Listed in ascending order, the four categories of distinctiveness are: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *American Television & Communications Corp. v. American Communications & Television, Inc.*, 810 F.2d 1546, 1548 (11th Cir.1987). A mark which suggests the basic nature of the product is considered generic and is typically incapable of achieving trademark protection because it has no distinctiveness. *Id.* A descriptive mark merely identifies a characteristic or quality of a product. Because a descriptive mark is not inherently distinctive, it may be protected only if it acquires a secondary meaning. *Id.*[4] A suggestive mark suggests the char-

4. Secondary meaning is the connection in the consumer's mind between the mark and the

product. *Coach House*, 934 F.2d at 1560 (citing *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d

acteristics of the product "and requires an effort of the imagination by the consumer in order to be understood as descriptive." *Id.* at 1549. Because a suggestive mark is inherently distinctive, no proof of secondary meaning is required for it to be protectable. *Id.* An arbitrary or fanciful mark is inherently distinctive and, because it bears no relationship to the product, is protectable without proof of secondary meaning. *Id.* Both the distinctiveness categorization and the existence of a secondary meaning are questions of fact. *Coach House,* 934 F.2d at 1560 (citations omitted).

**B. Inherently Distinctive?:** Golden Sun contends that the VIDA VITAL mark for nutritional supplements is inherently distinctive. According to Golden Sun, the mark VIDA VITAL is composed of Spanish words which, when translated into English, mean "vital life" or "vibrant life." Golden Sun claims that the mark is suggestive because the name "vital life" cannot be connected to nutritional supplements without an imaginative effort, and the mark evokes the energetic and vigorous lifestyle one desires from nutritional supplements, but does not specify any product quality. However, as Inmuno Vital points out, Golden Sun has offered no evidence, other than a mere translation, to support its conclusion that the mark is suggestive.[5] Therefore, this evidence is insufficient to warrant the granting of summary judgment.

Pointing out that Inmuno Vital obtained trademark registrations for VIDA VITAL

without submitting or being required to submit evidence of consumer recognition, Golden Sun argues that this is indisputable evidence that the VIDA VITAL mark is inherently distinctive. *See Independent Nail & Packing Co. v. Stronghold Screw Products, Inc.,* 205 F.2d 921, 925 (7th Cir.), *cert. denied,* 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391 (1953); *Big O Tire Dealers v. Goodyear Tire & Rubber Co.,* 561 F.2d 1365, 1369 (10th Cir.1977), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978). In response, Inmuno Vital argues that VIDA VITAL is descriptive for nutritional supplements, but inherently distinctive for its herbal tea products sold in a pharmacy bottle and advertised for its therapeutic effects.

█ A leading commentator has noted that a mark may fall under different categories of distinctiveness for different products. *See McCarthy on Trademarks and Unfair Competition,* Vol. 1, § 11.71, p. 20 (4th ed.1997). Therefore, a jury could find that the VIDA VITAL mark has a different distinctiveness categorization for Golden Sun's nutritional supplements and Inmuno Vital's herbal teas. In any event, neither party has established the distinctiveness of the VIDA VITAL mark for Golden Sun's nutritional supplements, and therefore the jury shall decide this disputed factual issue.

█ **C. Reverse Confusion:** The usual trademark infringement case involves a claim by a plaintiff with a substantial investment in a well-established

---

1531, 1536 n. 14 (11th Cir.1986)). In the absence of consumer survey evidence, four factors can be considered in determining whether a particular mark has acquired a secondary meaning: (1) the length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made to promote a conscious connection in the public's mind between the name and the product; and (4) the extent to which the public actually identifies the name with the plaintiff's product. *Id.* (citing *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1513 (11th Cir. 1984)). In the cross-motions for summary judgment, the parties did not address whether

Golden Sun had achieved secondary meaning. Although it is not clear, it appears that Golden Sun claims to have achieved secondary meaning in, at least, California. To the extent this remains a viable issue, the parties may submit an appropriate motion to address this issue prior to trial.

5. Since the words VIDA VITAL are Spanish, Golden Sun must also establish that the mark is "descriptive to that segment of the purchasing public which is familiar with that language." *See McCarthy on Trademark and Unfair Competition,* Vol. 1, § 11.34, pp. 59–60 (4th ed.1997).

trademark. The plaintiff would then seek recovery for the loss of income resulting from a second user attempting to trade on the goodwill associated with that established mark by suggesting to the consuming public that his product comes from the same origin as the plaintiff's product. Golden Sun's counterclaim, however, involves the doctrine of "reverse confusion." Under this doctrine, the infringer's use of the original user's mark creates sufficient confusion that the relevant market does not know who created the original product. *Capital Films Corp. v. Charles Fries Productions, Inc.*, 628 F.2d 387, 393 (5th Cir. 1980).

■■■ Although Inmuno Vital contends that the doctrine of reverse confusion is not available in Florida, "reverse confusion has now become a recognized doctrine within the scope of unfair competition, and [there is] no reason why it should not be applied [ ] unless the law [of] the forum ... would prevents its application." *Id.* at 393–94 (reverse confusion doctrine applies under Texas law); *Big O Tire Dealers*, 561 F.2d at 1369 (reverse confusion doctrine applies under Colorado law). Under Capital Films, the reverse confusion doctrine is presumed to apply in the Eleventh Circuit, but a state's substantive law may operate to prevent its application. The counterclaim defendant, Inmuno Vital, has the burden of establishing that the doctrine is not warranted under Florida law. *But see Glen Raven Mills Inc. v. Ramada International, Inc.*, 852 F.Supp. 1544, 1549–50 (M.D.Fla.1994) (plaintiff must establish the viability of a reverse confusion claim under the applicable state law). Since Inmuno Vital has not even attempted to meet this burden, Golden Sun's counterclaim is sustainable under the doctrine of reverse confusion.

## V. WHAT IS THE SCOPE OF GOLDEN SUN'S TRADE- MARK RIGHTS?

**A. Rights Established Through Use:** If the jury concludes that the VIDA VITAL mark is inherently distinctive for nutritional supplements, the Court must still determine the geographic scope of Golden Sun's trademark rights. Over eighty years ago, the Supreme Court established the general principles governing the territorial rights of trademark owners under the common law:

> That property in a trade-mark is not limited in its enjoyment by territorial bounds, but may be asserted and protected wherever the law affords a remedy for wrongs, is true in a limited sense. Into whatever markets the use of a trademark has extended, or its meaning has become known, there will the manufacturer or trader whose trade is pirated by an infringing use be entitled to protection and redress. But this is not to say that the proprietor of a trade-mark, good in the markets where it has been employed, can monopolize markets that his trade has never reached and where the mark signifies not his goods but those of another.... Since it is the trade, and not the mark, that is to be protected, a trade-mark acknowledges no territorial boundaries of municipalities or states or nations, but extends to every market where the trader's goods have become known and identified by his use of the mark. But the mark, of itself, cannot travel to markets where there is no article to wear the badge and no trader to offer the article.

*Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 415–16, 36 S.Ct. 357, 60 L.Ed. 713 (1916) (discussing the parties' common law rights to the "Tea Rose" label). In *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 94–95, 101, 39 S.Ct. 48, 63 L.Ed. 141 (1918), the Supreme Court similarly concluded that ownership of common law trademark rights does not "project the right of protection in advance of the extension of the trade," and a senior user may be prevented from entering a new market if a junior user has already acquired rights in that market. These principles, now collectively known as the "Tea Rose–Rectanus doctrine," remain alive today. *See Tally–Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1027–28 (11th

Cir.1989) (a senior user enjoys rights in the areas in which, through actual use, it has established a reputation for its mark, and in areas in which it might naturally expand); *Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383, 1394 (3d Cir.) (subsequent user protected in areas where the prior user had not established a market for goods), *cert. denied,* 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985); *Sweetarts v. Sunline, Inc.,* 380 F.2d 923, 929 (8th Cir.1967) (requiring "significant market penetration" before rights can attach), *quoted with approval in Sweetarts v. Sunline, Inc.,* 436 F.2d 705, 709 (8th Cir. 1971).

This Court must apply the principles established in these early Supreme Court cases to determine the scope of Golden Sun's trademark rights. However, before examining the extent to which Golden Sun had established its trade, the Court must conform its analysis to the type of product at issue and the market to which the product is directed. *See Wrist–Rocket Mfg. Co. v. Saunders Archery Co.,* 578 F.2d 727, 732 (8th Cir.1978) (there is "no simple dollar amount or population-to-sales ratio that will apply across the board to products of different types, uses and durability and that appeal to different segments of the population"); *Natural Footwear,* 760 F.2d at 1399 n. 35 (court must consider the general cost of the trademarked product; sales of $10,000.00 more likely to represent significant market penetration if the product is candy than if the product is an automobile). Since Golden Sun's product retails for much less than $50.00 per bottle, the Court will properly focus on the number of bottles sold rather than Golden Sun's gross sales. In addition, since the parties agree that the consumer market for this product is largely the Hispanic population, the Court will consider the smaller size of this market group in conducting the market penetration analysis.

Golden Sun did not establish an exceptionally significant trade in VIDA VITAL nutritional supplements prior to Inmuno Vital's first use of the VIDA VITAL mark. In the more than two years prior to Inmuno Vital's first use of the VIDA VITAL mark, Golden Sun sold only 20 bottles of VIDA VITAL products in Illinois, 16 in New Jersey, 124 in Florida, 648 in Texas, 1,564 in Puerto Rico, and 12,351 in California. With the possible exception of California and Puerto Rico, the Court finds that Golden Sun's sales prior to March 1994 do not establish trademark priority as a matter of law because Golden Sun's market penetration was *de minimus.*[6] *See Natural Footwear,* 760 F.2d at 1400 (Plaintiff's territorial rights limited to New Jersey because it had achieved *de minimus* retail clothing sales of less than $5,000 and less than 50 customers per state); *Sweetarts,* 380 F.2d at 929 & n. 2, n. 3 (factual issue presented whether the plaintiff was entitled to trademark protection in geographic areas where annual sales of candy ranged from $1,000.00 to $20,000.00, but annual sales in other areas totaling less than $75.00 held *de minimus* ); *ACCU Personnel, Inc. v. AccuStaff, Inc.,* 846 F.Supp. 1191 (D.Del.1994) (sales of over $200,000.00 to customers in Southeastern Pennsylvania, and over $3,000.00 in sales to customers in Northern Delaware, fell short of the *de minimus* threshold for a company providing temporary employee services); *Philip Morris, Inc. v. Imperial Tobacco Co., Limited,* 251 F.Supp. 362 (E.D.Va.1965) (sporadic and casual shipment of less than 51,000 cigarettes per year into the disputed jurisdiction did not create trademark rights), *aff'd,* 401 F.2d 179 (4th Cir.1968), *cert. denied,* 393 U.S. 1094, 89 S.Ct. 875, 21 L.Ed.2d 784 (1969). In the event that the jury finds that Golden Sun's VIDA VITAL mark for nutritional supplements is inherently dis-

---

**6.** In determining the scope of Golden Sun's purported trademark rights, the Court would prefer to scrutinize Golden Sun's market penetration on the basis of its natural trading areas. *Hanover Star,* 240 U.S. at 416, 36 S.Ct. 357. *But see id.* at 426, 36 S.Ct. 357 (Holmes, J., concurring) ("if [a trademark] is good in one part of the State it is good in all"). However, the evidence provided only permits analysis on a state-by-state basis.

tinctive, the jury shall also determine whether Golden Sun's sales in California and Puerto Rico were sufficient to warrant trademark protection.[7]

**B. The Zone of Natural Expansion:** Although Golden Sun's sales outside of California and Puerto Rico, in and of itself, do not warrant trademark protection, the Court must also determine whether the territorial extent of Golden Sun's trademark rights should be expanded under the doctrine of the "zone of natural expansion." Under this doctrine, a trademark owner whose business has continually expanded is granted rights in non-existing geographic markets. *Tally–Ho*, 889 F.2d at 1028. Trademark rights are recognized in these areas to protect a continually expanding trademark owner in areas where expansion is reasonably expected to occur. Under Eleventh Circuit jurisprudence, this Court must consider the following criteria in determining the scope of Golden Sun's imaginary zone of natural expansion:

(1) The geographic distance from Golden Sun's actual location to a point on the perimeter of the zone of expansion;

(2) The nature of Golden Sun's business and whether Golden Sun already has a large or small zone of actual market penetration or reputation;

(3) The history of Golden Sun's past expansion, and whether the company's growth has remained static for years or whether Golden Sun has continually expanded into new territories. Extrapolating this prior expansion, how long would it take Golden Sun to reach the periphery of the claimed expansion zone?

(4) Would it require an unusual 'great leap forward' for Golden Sun to enter the zone, or is the zone so close to existing locations that expansion would be (or is) a logical, gradual, step of the same length as those previously made?

*Id.* (citing J. McCarthy, *Trademarks and Unfair Competition* § 26:9, at 304–05 (2d Ed.1984)).

After considering these criteria, the Court finds that Golden Sun is not entitled to expanded trademark protection under the "narrowly defin[ed]" doctrine of the "zone of natural expansion." *Tally–Ho*, 889 F.2d at 1028. The Eleventh Circuit has stated that the extent of the zone of expansion is "generally considered as of the date of the junior user's first use." *Id.*[8] Golden Sun's sales of VIDA VITAL products did not significantly increase during the two years prior to Inmuno Vital's adoption of the mark and, given Golden Sun's poor sales figures and almost non-

---

7. At oral argument, counsel for Golden Sun argued that if the VIDA VITAL mark for dietary supplements is a suggestive mark, "there is no question but that we own the mark and [have rights to the mark in] all the areas where we were selling, no matter how much we were selling, and where we were prepared to expand." In their written submissions, however, the parties have not briefed whether the market penetration analysis is or is not applicable to both suggestive marks and descriptive marks which have attained secondary meaning. In this opinion, the Court concludes that the analysis applies to both categories of distinctiveness. To the extent that there is contrary Eleventh Circuit authority directly addressing this issue, the parties may request reconsideration of the Court's conclusion.

8. Golden Sun suggests that this Court should reject the Eleventh Circuit's analysis and find

that Inmuno Vital's first use—a single sale to a customer in Georgia—is insufficient to cut off Golden Sun's trademark rights in California (and elsewhere). Although Eleventh Circuit authority prevents this Court from accepting Golden Sun's approach, the Court does agree that a senior user's territorial rights in the mark could later expand if the junior user's use of the mark also became static. For example, if Inmuno Vital had limited its sales to Georgia, and Golden Sun had limited its sales to California, then the rights to the mark in California could belong to Golden Sun, the rights to the mark in Georgia could belong to Inmuno Vital, and either company (or a third party) could later obtain rights to the mark in the remainder of the country. Here, however, and as discussed in the main body of this opinion, Inmuno Vital's use of the mark did not remain static after its first sale in Georgia in 1994.

existent advertising, the Court would have to make a "great leap" to conclude that, in the absence of any knowledge of Inmuno Vital's success selling its VIDA VITAL product, Golden Sun would have significantly expanded its sales of VIDA VITAL nutritional supplements. Although Golden Sun may have a national distribution network for its other products, there was no indication that Golden Sun would have expanded its marketing of VIDA VITAL to the full extent of its existing distribution system. Therefore, at the time of Inmuno Vital's first use, Golden Sun's rights in the VIDA VITAL mark was limited to, at most, Puerto Rico and California.

## VI. WHERE GOLDEN SUN'S TRADEMARK RIGHTS VIOLATED?

**A. Effect of Inmuno Vital's Federal Registration:** The United States Patent and Trademark Office issued Inmuno Vital federal registrations for its VIDA VITAL herbal tea products.[9] Therefore, Inmuno Vital is the presumed legal owner of the VIDAL VITAL mark for herbal tea products as of the date it filed its application for federal registration—June 19, 1995. *See* 15 U.S.C. § 1057(b), 1115(a). Golden Sun contends that under *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978), Inmuno Vital's rights based on this federal registration are limited to "herbal teas for food purposes," and do not extend to nutritional supplements. Golden Sun also contends that Inmuno Vital's VIDA VITAL product is misbranded because Inmuno Vital's VIDA VITAL products are actually nutritional supplements, not herbal teas. Therefore, Golden Sun concludes that Inmuno Vital's federal trademark registrations are irrelevant because they relate to a product not at issue in this case.

In *Miller*, the Miller Brewing Company owned a federal trademark registration on the word LITE in connection with "beer

with no available carbohydrates." *Id.* at 77. After Miller obtained this federal registration, the Heilman Brewing Company began selling a "light" beer. *Id.* at 79. Since Heilman's "light" beer contained available carbohydrates, the Court held that Miller's registrations were not *prima facie* evidence of Miller's exclusive right to use the LITE mark on Heilman's beer, and therefore the federal trademark registration was not probative of Miller's claim. *Id.* The Court thus conducted a common law trademark analysis and concluded that "light" and its phonetic equivalent "lite" is a generic or common descriptive term as applied to beer and thus could not be exclusively appropriated by Miller. *Id.* at 81.

The decision in the Eleventh Circuit that is the most similar to *Miller* is *E. Remy Martin & Co. v. Shaw–Ross Intern. Imports*, 756 F.2d 1525 (11th Cir.1985). However, in *E. Remy*, the Eleventh Circuit concluded that "the rights of a registered trademark owner are not limited to protection with respect to the specific goods stated on the certificate ... but extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods." *Id.* at 1530 (finding that the prior user's federally registered mark on the words "Remy" or "E. Remy" for cognac was sufficient to enjoin a subsequent user's use of the same mark for wines or sparking wines because the products were likely to be confused).

■■■ Unlike in *E. Remy*, here there is a factual dispute whether the owner of the federal trademark registration actually sells the product for which it has obtained trademark registration. This factual dispute presents one of the main issues in this case: whether Cat's Claw may properly be categorized as both a nutritional supplement and an herbal tea. The USPTO's trademark registration process only provides conflicting factual inferences. Al-

9. Inmuno Vital also obtained registration of the VIDA VITAL mark from the State of Flori-da on October 30, 1995.

though the USPTO, in accepting Inmuno Vital's "Statement of Use" that the Cat's Claw products identified in the class 30 registration certificates were properly identified, impliedly found that Inmuno Vital's Cat's Claw is a herbal tea, there is also a pending trademark registration for this same product under class 5 of the federal registration system as a nutritional supplement! Unless the parties can present authority to the contrary (and none are provided in the cross-motions for summary judgment), this factually disputed issue—whether Cat's Claw can be both a nutritional supplement and an herbal tea (and consequently, whether Inmuno Vital's federal trademark registration is to be given presumptive effect)—shall be resolved by the jury.

**B. Was Inmuno Vital's Adoption of the Mark in Bad Faith?:** Golden Sun also contends that Inmuno Vital's use of the VIDA VITAL mark for its herbal tea products was not in good faith and therefore this Court should find, as a matter of law, that its nutritional supplements and Inmuno Vital's herbal teas are likely to be confused. Golden Sun bases this allegation on Inmuno Vital's failure to respond to Golden Sun's "cease and desist letter," which Golden Sun sent to Inmuno Vital in August 1995 after it learned of Inmuno Vital's federal trademark application. In this letter, Golden Sun informed Inmuno Vital of its prior use and directed Inmuno Vital to discontinue its use of the VIDA VITAL mark. Inmuno Vital ignored this letter and continued selling VIDA VITAL products.

■ Golden Sun is correct that adoption of a mark in order to take advantage of the good will or reputation of a prior user is probative of likelihood of confusion. *See Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1230 (3d Cir.1978). However, there is no evidence in the record that Inmuno Vital took advantage of any goodwill that Golden Sun might have established for its VIDA VITAL nutritional supplements. It is undisputed that Inmuno Vital's initial adoption of the VIDA

VITAL mark was in good faith and without knowledge of Golden Sun's prior use. Inmuno Vital was not required to forego expansion of its product in August 1995 after receiving Golden Sun's "cease and desist letter" and learning of Golden Sun's prior use, so long as Inmuno Vital's use of the mark did not encroach on Golden Sun's area of natural expansion. *See Weiner King,* 615 F.2d at 522 n. 2. Therefore, Inmuno Vital's knowledge of Golden Sun's existence, in and of itself, is insufficient to support a finding of bad faith in all areas (with the possible exception of California and Puerto Rico). *See id.* at 522 ("while an attempt to 'palm off,' or a motive to 'box in' a prior user by cutting into its probable areas of expansion, each necessarily flowing from knowledge of the existence of the prior user, might be sufficient to support a finding of bad faith, mere knowledge of the existence of the prior user should not, by itself, constitute bad faith").

### VII. WERE INMUNO VITAL'S TRADEMARK RIGHTS VIOLATED?

■ **A. Registration-based Rights:** As stated *supra,* if the jury concludes that Inmuno Vital's VIDA VITAL Cat's Claw may properly be classified an herbal tea, Inmuno Vital will enjoy presumptive federal trademark rights beginning in August 1995. Assuming that the jury also concludes that Golden Sun enjoys trademark rights in California and Puerto Rico for VIDA VITAL nutritional supplements, under *Miller* and *E. Remy* the proper inquiry is whether Inmuno Vital's herbal teas are likely to be confused with Golden Sun's nutritional supplements. *See E. Remy,* 756 F.2d at 1530 (the jury shall determine whether the relevant consumers would find "that a single producer is likely to put out" Cat's Claw both as a nutritional supplement and as an herbal tea). The Court declines to decide this issue as a matter of law. If the jury finds that there are two separate products, but that they are likely to be confused, then Golden Sun will have infringed on Inmuno Vital's national trademark rights (except possibly in California

and Puerto Rico, where the opposite conclusion could be reached if Golden Sun previously obtained rights in these states).[10] If the jury determines that there are two separate products, and that they are not likely to be confused, then Golden Sun will own trademark rights in VIDA VITAL for nutritional supplements, and Inmuno Vital will own trademark rights in VIDA VITAL for herbal teas.

**B. Common Law Trademark Rights:** If the jury concludes that Cat's Claw is a nutritional supplement and not an herbal tea (and therefore Inmuno Vital's federal trademark registrations are held inapplicable), Inmuno Vital has nevertheless established that it owns nationwide common law trademark rights to the VIDA VITAL mark (with the possible exception of California and Puerto Rico). First, Golden Sun maintains that this VIDA VITAL product is suggestive. In any event, Inmuno Vital has submitted significant evidence that it has achieved secondary meaning—extensive advertising, a large and growing volume of sales, and a widespread reputation as a seller of VIDA VITAL Cat's Claw.[11] See Coach House, 934 F.2d at 1560. Second, even if Inmuno Vital's actual sales of VIDA VITAL Cat's Claw did not grant it national trademark protection by August 1995, Inmuno Vital nevertheless enjoyed national protection

under the doctrine of natural expansion because it had achieved a large zone of market penetration and was rapidly expanding into new territories. See Tally–Ho, 889 F.2d at 1028. By no later than August 1995, it was logical to conclude that Inmuno Vital would expand its market to those areas of the United States in which it did not already own trademark rights.

Golden Sun began selling its VIDA VITAL Cat's Claw nutritional supplements outside of California and Puerto Rico in August 1995. Assuming the jury concludes that Cat's Claw is a nutritional supplement, and not an herbal tea (in which case the parties appear to agree that there would be a likelihood of confusion between their VIDA VITAL Cat's Claw products), then the Court would have to conclude that Golden Sun violated Inmuno Vital's trademark rights in all areas except, potentially, California and Puerto Rico.[12]

## VIII. FALSE ADVERTISING AND THE AFFIRMATIVE DEFENSE OF UNCLEAN HANDS

**■ A. The Standard:** Golden Sun raises the issue of false advertising both as a defense to Inmuno Vital's trademark infringement claim under an "unclean hands" theory and as an affirmative claim for relief under section 43(a) of the Lanham Act.[13] In the seminal case on the

---

10. Golden Sun may not extend its use of the VIDA VITAL mark to goods that it has not previously sold where the result would be a likelihood of confusion. *Key Chemicals, Inc. v. Kelite Chemicals, Corp.,* 59 C.C.P.A. 1231, 464 F.2d 1040, 1043 (Cust. & Pat.App.1972).

11. Inmuno Vital has presented the following evidence concerning its reputation and goodwill: a November 6, 1995 cover story in the national magazine *Newsweek* which references VIDA VITAL as a source of Cat's Claw, repeated references to Inmuno Vital's Cat's Claw in Alexander Schauss' 1996 book *The Health Benefits of Cat's Claw,* and a September 1995 article in *El Nuevo Herald* in which Inmuno Vital's VIDA VITAL is recognized as "one of the most sold [Cat's Claw] products in Miami."

12. Golden Sun was admittedly attracted to the enormously potential profits associated

with the trendy "Cat's Claw" product. Counsel for Golden Sun stated, at oral argument, that "The fact is Cat's Claw was a new product. Everybody in the market jumped on it, including us. If you didn't have it in the Hispanic line, the line of Hispanic nutritional supplements, you were going to cripple your line. It was a must have item and it was a big seller." Furthermore, and curiously enough, in 1996 Golden Sun achieved significant sales of its VIDA VITAL Cat's Claw product even though it spent almost no money advertising the product. Sales of Cat's Claw under the GOLDEN SUN mark, however, were sparse. *See* Deposition of Alcides Rodriguez, vol. 2, at 259–60.

13. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1) provides:

> Any person who, on or in connection with any goods or services ... uses in commerce

unclean hands defense, the Supreme Court stated:

> [W]hen the owner of a trade-mark applies for an injunction to restrain the defendant from injuring his property by making false representations to the public, it is essential that the plaintiff should not in his trade-mark, or in his advertisements and business, be himself guilty of any false or misleading representations; that if the plaintiff makes any material false statement in connection with the property which he seeks to protect, he loses the right to claim the assistance of a court of equity; that where any symbol or label claimed as a trademark is so constructed or worded as to make or contain a distinct assertion which is false, no property can be claimed on it, or, in other words, the right to the exclusive use of it cannot be maintained.

*Worden & Co. v. California Fig Syrup Co.*, 187 U.S. 516, 528, 23 S.Ct. 161, 47 L.Ed. 282 (1903) (laxative named "Syrup of Figs" unprotectable where product contains no figs or fig juice). In the Eleventh Circuit, a defendant attempting to invoke the unclean hands defense must satisfy two requirements. *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 450 (11th Cir. 1993). First, the defendant must demonstrate that the plaintiff's wrongdoing is directly related to the claim against which it is asserted. *Id.* at 451 (citing *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933)). Second, even if directly related, the plaintiff's wrongdoing does not bar relief unless the defendant can show that it was personally injured by the plaintiff's conduct. *Id.* (citing *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir.1979), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980)).

In *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1355 (11th Cir.1983), the Court upheld a lower court's decision not to apply the unclean hands defense where the Plaintiff inadvertently attached a federal registration symbol to an unregistered mark in two advertisements. Interpreting *Worden* as holding that "a court should not protect the exclusive right to use a name or mark which is misleading to the public," the Court noted other courts' reluctance to "find unclean hands where the misuse of the registration symbol was negligent or immaterial to the litigation." *Id.*

■ An affirmative claim for false advertising under the Lanham Act is similar to the unclean hands defense.[14] To prevail in a false advertising suit under section 43(a), a plaintiff must prove that the defendant's ads were false or misleading, actually or likely deceptive, material in their effects on buying decisions, connected with interstate commerce, and actually or likely injurious to the plaintiff. *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.C.Cir.1990); *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 ("To prevail, the defendant must demonstrate that the plaintiff's conduct is inequi-

---

any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of his or her or another person's goods, ser-

vices or commercial activities ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

14. The parties did not present Golden Sun's affirmative claim of relief for false advertising to the Court in the pending cross-motions for summary judgment. This is likely because the claim for false advertising is a legal claim properly resolved by the jury. However, given the overlapping evidence supporting Golden Sun's two claims, and the Court's resolution of the unclean hands defense, the Court will also discuss the false advertising claim.

table and that the conduct relates to the subject matter of its claims"). Golden Sun must also present evidence that there was actual deception by a significant number of customers. *See, e.g., PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105 (2d Cir.1997). However, Golden Sun's presentation of evidence of actual deception is *de minimus.*

█] **B. Allegations:** Golden Sun's affirmative defense of unclean hands is based on Inmuno Vital's: (a) incompliance with FDA regulations; (b) claim that a percentage of its profits will be donated to medical research organizations; (c) misbranding of its VIDA VITAL product; and (d) allegedly false advertisements in which it claims that VIDA VITAL cures certain diseases, including cancer. The allegedly false advertisements to which Golden Sun refers include: (1) Andres Garcia Garcia ads in which the well-known Mexican soap opera star claims that his cancer was cured by VIDA VITAL; (2) an ad placed by Inmuno Vital's President in which he claimed that VIDA VITAL cures AIDS; and (3) an endorsement advertisement placed by "Centro de Investigacion de Andres Garcia," an organization owned by the Presidents of Inmuno Vital and Andres Garcia. As discussed below, Golden Sun has not presented sufficient evidence that would warrant applying the unclean hands defense and preventing the jury from considering Inmuno Vital's claims of trademark infringement.

**C. Alleged Incompliance with Regulations:** Golden Sun argues that Inmuno Vital's claims to trademark rights are barred by the illegality of its trademark use because the Federal Trade Commission Act ("FTCA") makes deceptive acts or practices unlawful, and the Federal Food, Drug and Cosmetic Act ("FDCA") prohibits the misbranding of products. According to Golden Sun, Inmuno Vital falsely claims that its Cat's Claw product is a curative good, and furthermore, since the goods are misbranded, they are not lawfully used in commerce and cannot be the basis for registering a trademark.

To the extent that Golden Sun relies on these federal statutes, its claims fail as a matter of law because no private right of action exists to redress alleged violations of the FDCA. *See* 21 U.S.C. § 337(a) (restricting enforcement to suits by the United States); *PDK Labs,* 103 F.3d at 1112; *Gile v. Optical Radiation Corp.,* 22 F.3d 540, 544 (3d Cir.), *cert. denied,* 513 U.S. 965, 115 S.Ct. 429, 130 L.Ed.2d 342 (1994); *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1139 (4th Cir.1993) ("permitting [plaintiff] to proceed on the theory that the defendants violated § 43(a) merely by placing their drugs on the market would, in effect, permit [the plaintiff] to use the Lanham Act as a vehicle by which to enforce the [FDCA] and the regulations promulgated thereunder"), *cert. denied,* 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). *See also Dial A Car, Inc. v. Transportation, Inc.,* 82 F.3d 484, 488–89 (D.C.Cir.1996) (rejecting claim that the defendants misrepresented that their taxicabs were authorized, pursuant to a municipal regulation, to provide the same corporate account services as Dial A Car provides, because the plaintiff "is simply using the Lanham Act to try to enforce its preferred interpretation of [the municipal regulation] instead of adjudicating the issue before the [D.C. Taxicab] Commission"). *But see Erva Pharmaceuticals, Inc. v. American Cyanamid Co.,* 755 F.Supp. 36, 40 (D.P.R.1991) (a plaintiff cannot allege trademark infringement and seek the protection of the trademark laws if it is marketing its product in violation of the FDCA). Rather, the right to enforce the provisions of the FDCA lies exclusively within the federal government's domain, by way of either the FDA or the Department of Justice. *Summit Technology, Inc. v. High–Line Medical Instruments Co., Inc.,* 922 F.Supp. 299, 306 (C.D.Cal. 1996) (citing *Fender v. Medtronic, Inc.,* 887 F.Supp. 1326, 1329 (E.D.Cal.1995)).

**D. Donation of Profits:** Golden Sun also contends that the unclean hands defense should apply because the legend on Inmuno Vital's labels and its print advertising inaccurately states that "a percent-

age of [Inmuno Vital's] profits will be donated to the research of Aids, cancer, and arthritis." However, Golden Sun admits that Inmuno Vital donated $16,000 to charitable organizations in 1995. Although some might consider this to be a small percentage of Inmuno Vital's profits, Inmuno Vital did in fact make the charitable contribution, and therefore the advertisement is neither false nor misleading. Therefore, Golden Sun's unclean hands defense may not be based on Inmuno Vital's pledge that a share of its profits will be donated to medical research.

**E. Misbranding:** Golden Sun contends that Inmuno Vital's trademark registrations should not be given presumptive effect because the product is misbranded. According to Golden Sun, Inmuno Vital has misbranded its product as an herbal tea despite the fact that the Cat's Claw is sold in capsule form and thus is a nutritional supplement, and not a beverage. However, Inmuno Vital provides an instructional booklet inside each Cat's Claw bottle explaining how to use the product as a tea.[15] More importantly, the USPTO, in accepting Inmuno Vital's Statement of Use that the products identified in the registration certificates are properly identified, found that Inmuno Vital's Cat's Claw is a herbal tea. The Court finds that application of the unclean hands defense is not warranted based on any alleged misbranding of a product that the USPTO accepted as properly identified.

**F. Curative Claims:** Golden Sun contends that Inmuno Vital's claims that its Cat's Claw products will cure certain diseases has created (and is likely to create) consumer confusion, that it has eroded Golden Sun's goodwill, and that it constitutes a danger to the public. Golden Sun draws the Court's attention to three groups of allegedly false advertisements.

**(1). Andres Garcia:** The Mexican soap opera star appeared in numerous ads in which he claimed that his cancer was cured by VIDA VITAL. In one representative

ad, Andres Garcia states: "During the most difficult moments of my sickness (prostate cancer), I received a lot of recommendations; one of them, was to take the Cat's Claw of Vida Vital. Thanks to Vida Vital, I overcame my condition when the doctors already had given up hope." Although Inmuno Vital claims that the ads were sponsored by Amazon Botanical Research Corporation, an inactive corporation incorporated in Florida, counsel for Inmuno Vital admitted, during oral argument, that Inmuno Vital paid for at least one of these advertisements. Therefore, for purposes of this motion, the Court will treat these advertisements as having been placed by Inmuno Vital, and therefore will not address Golden Sun's allegation that Inmuno Vital is funneling Andres Garcia money through his brother, who receives approximately ten percent of Inmuno Vital's revenues for "Mexican advertising promotion and marketing expenses."

Golden Sun has offered no evidence that Cat's Claw did not contribute to Andres Garcia's recovery from cancer, and Inmuno Vital has not submitted any evidence corroborating its claims of Cat's Claw's healing powers. On which party should the court place the burden of presenting evidence on this issue? The Seventh and Second Circuits recently concluded that the nature of the advertisement dictates the burden that the parties must bear. *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081 (7th Cir.1994) (adopting *Castrol Inc. v. Quaker State Corp.*, 977 F.2d 57 (2d Cir.1992)). Where the advertisement is in the form of an "establishment claim" (for example, "the tests show x"), the claim can be proven "literally false" (for example, by showing that the cited tests do not establish the proposition claimed), and thus the advertising party must present the tests and the party challenging the advertisement establishes its burden by showing that the tests did not establish the proposition for which they were cited. *Id.* (citing *Procter &*

---

**15.** The instructions state "Simply open two capsules and empty contents into water.... Boil slowly for ten minutes, remove from heat and let cool."

Gamble Co. v. Chesebrough–Pond's Inc., 747 F.2d 114 (2d Cir.1984); McNeil–P.C.C. v. Bristol–Myers Squibb Co., 938 F.2d 1544 (2d Cir.1991)). However, where the advertiser makes a "non-establishment claim," such as an independent claim (for example, by stating that Vicks cough syrup "starts to work the instant you swallow"), see Sandoz Pharmaceuticals Corp. v. Richardson–Vicks, Inc., 902 F.2d 222, 227–29 (3rd Cir.1990),[16] or a comparison claim (for example, by stating that "our product works faster than theirs"), see Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 943 (3rd Cir.1993), proof that the advertiser had no support for its statement would not necessarily prove falsity, and therefore the party challenging the advertisement is required to present affirmative proof of falsity to establish liability. Id. See also Mylan, 7 F.3d at 1138 (the plaintiff bears the burden of proving that the defendant's advertisements "are not sufficiently reliable to permit one to conclude with reasonable certainty that they established the claim made").

The advertisements in this case are properly classified as non-establishment independent claims, and therefore Golden Sun must present some evidence that the advertisements are false in order to both raise the defense of unclean hands and to state the affirmative claim of false advertising. Golden Sun has admittedly presented no such evidence. Therefore, Golden Sun cannot rely on these advertisements to present either an affirmative defense to Inmuno Vital's trademark infringement claim or an affirmative claim for false advertising.

▮ Inmuno Vital also presents a persuasive argument that Golden Sun's allegations of illegality is not related to the trademark at issue. Any illegality asserted to defeat the enforcement of a trademark must be specifically related to the trademark which is at issue and not collateral to the trademark itself. See Worden,

187 U.S. at 528, 23 S.Ct. 161 (application of unclean hands defense appropriate where the products sold under the SYRUP OF FIGS mark were not actually made from figs); Shatel, 697 F.2d at 1355 (alleged illegal conduct that is collateral to the trademark itself cannot trigger an unclean hands defense). As Inmuno Vital points out, the trademark at issue here is VIDA VITAL, not "CANCER CURE," and therefore the alleged illegality is not related to the trademark at issue. See, e.g., Mitchell Brothers Film Group, 604 F.2d at 863–64 ("limiting copyright protection on a broad public injury rationale would lead to absurd and unacceptable results"); Republic Molding Corporation v. B.W. Photo Utilities, 319 F.2d 347, 350 (9th Cir.1963) (requiring a "relevant connection" between the trademark and the alleged illegality). Other courts have found that false advertising of a trademark owner's product does not compel application of the unclean hands defense. See Fuddruckers, 826 F.2d at 847 (refusing to apply unclean hands defense where the trademark owner advertised its hamburger meat as chopped steak) (citing Shatel, 697 F.2d at 1355); W.E. Bassett Co. v. Revlon, Inc., 305 F.Supp. 581, 589 (S.D.N.Y.1969).

(2). **President's Advertisement:** Golden Sun contends that Inmuno Vital should be accorded no trademark rights because of certain statements made by Inmuno Vital's President, Dexter Backus, in a newspaper article addressing the curative powers of Cat's Claw. However, in the article Mr. Backus made no independent claims, but merely reiterated what had previously been reported in the Miami Herald. Mr. Backus stated that "The Miami Herald published ... a lengthy article which said that Dr. Inchaustegui was using cat's claw in Peru to treat AIDS, and had succeeded in reverting the negative condition of several of his patients, who from being HIV positive had become HIV negative." Therefore, as a matter of law, these statements are not actionable.

16. "[W]here the advertisements [in this case, related to a drug's effectiveness] are not literally false ... [the] plaintiff bears the burden of proving actual deception by a preponderance of the evidence." Id.

(3). **Endorsement:** In its advertising, Inmuno Vital displays a seal that Golden Sun argues implies that it is endorsed by the "Centro de Investigacion de Andres Garcia." The Centro de Investigacion has an office in Mexico City at the same address as a company called Mexico Vital S.A. de C.V., and Golden Sun claims that Mexico Vital is owned by the individual owners of Inmuno Vital, together with Andres Garcia's family. Although Golden Sun contends that the Centro de Investigacion is a "sham" organization, Golden Sun does not argue that this organization does not support Inmuno Vital. Although it is unclear what role the Centro de Investigacion plays in Inmuno Vital's marketing practices, Golden Sun has not presented sufficient evidence on this issue to warrant application of the unclean hands defense.

## IX. DAMAGES

 The parties also dispute the scope of the potential remedy. The damages provision of the Lanham Act stipulates:

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office ... shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judg-

ment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C.A. S 1117. This recovery is cumulative, that is, the court may award the registrant both its damages and the infringer's profits. *Babbit Electronics, Inc. v. Dynascan Corp.,* 38 F.3d 1161, 1182 (11th Cir.1994). The statute vests considerable discretion in the district court, and "no hard and fast rules dictate the form or quantum of relief." *Burger King Corp. v. Mason,* 710 F.2d 1480, 1495 & n. 11 (11th Cir.1983).

Although an extensive discussion of damages is premature, the Court will address some of the concerns expressed by the parties in the cross-motions for summary judgment. To the extent that Golden Sun is later deemed entitled to damages, Inmuno Vital contends that Golden Sun cannot recover actual damages because Golden Sun's sales of its VIDA VITAL products increased exponentially despite Golden Sun's lack of advertising. Although Inmuno Vital presents a strong argument, the Court will not rule on this issue until liability has been conclusively established. Furthermore, at this stage of the proceedings, the Court will not rule out the possibility that the assessment of an infringer's gross sales is an appropriate remedy. However, the Court does agree that, to the extent that actual confusion resulted from the trademark infringement, corrective advertising damages is an available remedy. *See American Farm Bureau Fed. v. Ala. Farmers,* 935 F.Supp. 1533, 1551 (M.D.Ala.1996).

] Inmuno Vital also contends that Golden Sun could never be entitled to any of its VIDA VITAL profits. To recover an accounting of profits, a plaintiff "need not demonstrate actual damage[s]," and need not show "a higher showing of culpability on the part of the defendant,"

so long as the defendant is purposely using the trademark. *Burger King Corp. v. Mason,* 855 F.2d 779, 780 (11th Cir.1988). Further, a defendant need not have attempted to "pass off" its products as those of the plaintiff in order for profits to be an available remedy. *Id.; John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 978 (11th Cir.1983). Therefore, if Golden Sun obtained trademark rights, then Inmuno Vital's profits are a potential remedy, but only those profits earned in the states in which Golden Sun obtained trademark rights, and only those profits which accrued after August 1995, when Inmuno Vital received the "cease and desist letter" and became aware of Golden Sun's prior use of the mark.

## X. CONCLUSION

Therefore, it is

ADJUDGED that the parties' cross-motions for summary judgment are DENIED.

DONE AND ORDERED.